AO 91 (Rev. 11/11) Criminal Complaint

# UNITED STATES DISTRICT COURT
## for the
### Southern District of Florida

| United States of America | ) | |
|---|---|---|
| v. | ) | |
| Tonye Johnson | ) | Case No. 20-MJ-6450-AOV |
| | ) | |
| | ) | |
| | ) | |
| | ) | |
| Defendant(s) | | |

## CRIMINAL COMPLAINT

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about the date(s) of May 14, 2020 to August 25, 2020 in the county of Broward in the Southern District of Florida, the defendant(s) violated:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. § 1343 | Wire Fraud |
| 18 U.S.C. § 1344 | Bank Fraud |
| 18 U.S.C. § 1349 | Conspiracy to Commit Wire and Bank Fraud |

This criminal complaint is based on these facts:
SEE ATTACHED AFFIDAVIT.

☑ Continued on the attached sheet.

_Complainant's signature_

Michael Benivenga, Speical Agent, IRS-CI
_Printed name and title_

Sworn to before me and signed in my presence.

Date: September 18, 2020

_Judge's signature_

City and state: Fort Lauderdale, Florida   Hon. Alicia O. Valle, U.S. Magistrate Judge
_Printed name and title_

## AFFIDAVIT

I, Michael Benivegna, being first duly sworn, hereby depose and state as follows:

### INTRODUCTION AND AGENT BACKGROUND

1. I make this Affidavit in support of a criminal complaint charging TONYE JOHNSON ("JOHNSON") with wire fraud, bank fraud, and conspiracy to commit wire fraud and bank fraud, in violation of 18 U.S.C. §§ 1343, 1344, and 1349, from on or about May 14, 2020, to at least on or about August 25, 2020, in the Southern District of Florida, and elsewhere (the "Target Offenses").

2. JOHNSON and conspirators have participated in a scheme to obtain by fraud millions of dollars in forgivable loans through the Paycheck Protection Program ("PPP") and other government programs, and have done so by conspiring with a person now cooperating with the investigation ("CHS 2") and others. JOHNSON obtained a fraudulent PPP loan for his own company, Synergy Towing & Transportation LLC ("Synergy"), a Pennsylvania limited liability company, with CHS 2 providing falsified documents and assisting in submitting the application on JOHNSON's behalf in exchange for a kickback from the loan proceeds. To inflate the size of these PPP loans, and the corresponding kickbacks, the conspirators relied on a variety of false statements, including by submitting falsified bank statements and payroll tax forms. For example, the conspirators used nearly identical versions of the same fabricated bank statements, recycled in the PPP applications for multiple companies with minor changes.

3. The conspirators in the scheme planned or prepared at least 90 fraudulent applications, most of which were submitted. Based on the evidence investigators have reviewed to date, CHS 2, JOHNSON, and their co-conspirators applied for PPP loans that are together worth more than $24 million dollars, with at least approximately 42 of those loans approved and funded

for a total of approximately $17.4 million. Certain of those loan recipients then wired a kickback of varying amounts, often approximately 25% of the fraudulent loan proceeds, to an account controlled by CHS 2.

4. I am a Special Agent with the United States Department of The Treasury, Internal Revenue Service, Criminal Investigation ("IRS-CI") and have been employed in this capacity since October 2016. I am presently assigned to the Miami Field Office. My duties as a Special Agent include the investigation of possible criminal violations of the Internal Revenue Code (Title 26 of the United States Code), the Bank Secrecy Act (Title 31 of the United States Code), and the Money Laundering Statutes (Title 18 of the United States Code). I graduated from the Criminal Investigator Training Program at the Federal Law Enforcement Training Center in April 2017 and the Special Agent Investigative Techniques program at the National Criminal Investigation Training Academy in July 2017. In these two programs, I studied a variety of law enforcement tactics and criminal investigator techniques relating to tax and financial crimes. Since becoming an IRS-CI Special Agent, I have personally investigated and assisted in investigations relating to the Internal Revenue Laws and financial crimes. Recently, I have been assigned to work with the U.S. Department of Justice and other law enforcement partners, including the Federal Bureau of Investigation and the Small Business Administration Office of Inspector General, to investigate possible fraud associated with the stimulus and economic assistance programs created by the federal government in response to the COVID-19 program.

5. The facts in this Affidavit come from my personal observations, my training and experience, and information obtained from other members of law enforcement and from witnesses. This Affidavit is intended to show merely that there is sufficient probable cause and does not set

forth all of my knowledge about this matter.[1]

## PROBABLE CAUSE

*The Paycheck Protection Program*

6.    The Coronavirus Aid, Relief, and Economic Security ("CARES") Act is a federal law enacted in or around March 2020 and designed to provide emergency financial assistance to the millions of Americans who are suffering the economic effects caused by the COVID-19 pandemic. One source of relief provided by the CARES Act was the authorization of up to $349 billion in forgivable loans to small businesses for job retention and certain other expenses, through a program referred to as the PPP. In or around April 2020, Congress authorized over $300 billion in additional PPP funding.

7.    In order to obtain a PPP loan, a qualifying business must submit a PPP loan application, which is signed by an authorized representative of the business. The PPP loan application requires the business (through its authorized representative) to acknowledge the program rules and make certain affirmative certifications in order to be eligible to obtain the PPP loan. In the PPP loan application, the small business (through its authorized representative) must state, among other things, its: (a) average monthly payroll expenses; and (b) number of employees. These figures are used to calculate the amount of money the small business is eligible to receive under the PPP. In addition, businesses applying for a PPP loan must provide documentation showing their payroll expenses.

8.    A PPP loan application must be processed by a participating lender. If a PPP loan

---

[1]    The conduct and charges described in this Affidavit are part of a larger investigation that is being conducted in this District and elsewhere. As a result, not all numbered sources and anonymous individuals and entities are described in every filing. I have included in this Affidavit only those individuals and entities I have deemed necessary to explain the particular facts set forth here.

application is approved, the participating lender funds the PPP loan using its own monies, which are 100% guaranteed by the Small Business Administration ("SBA"). Data from the application, including information about the borrower, the total amount of the loan, and the listed number of employees, is transmitted by the lender to the SBA in the course of processing the loan.

9. PPP loan proceeds must be used by the business on certain permissible expenses—payroll costs, interest on mortgages, rent, and utilities. The PPP allows the interest and principal on the PPP loan to be entirely forgiven if the business spends the loan proceeds on these expense items within a designated period of time after receiving the proceeds and uses a certain amount of the PPP loan proceeds on payroll expenses.

### The Scheme to Obtain Fraudulent PPP Loans

10. On or about May 13, 2020, Phillip J. Augustin ("Augustin") and CHS 2 worked together to submit a fraudulent PPP loan application on behalf of a company owned by Augustin. Augustin submitted a PPP loan of $84,515 to a federally insured bank (hereinafter "Bank 3"), through a third-party company processor (hereinafter "Bank Processor 1").[2] The application included bank statements that are clear forgeries, and CHS 2 has admitted that the application was based on documents that he falsified for Augustin.[3]

11. Following the success of that initial fraudulent PPP application, Augustin and CHS

---

[2]   All banks referenced in this Affidavit are insured by the Federal Deposit Insurance Corporation.

[3]   On June 25, 2020, investigators arrested CHS 2 and another person now cooperating with the investigation ("CHS 3") and executed search warrants at their residences. Following his arrest, CHS 2 chose to cooperate with the investigation in the hope of obtaining favorable consideration in connection with his pending charges. CHS 2 was interviewed on that day, and has continued to cooperate with the investigation after obtaining counsel. Most of his statements related herein have been corroborated by records obtained from third parties or recovered from his electronic devices.

2 began to work on obtaining more and larger PPP loans for Augustin's associates and others, generally for several hundred thousand dollars for each loan, up to as much as approximately $1.24 million. Based on the evidence investigators have reviewed so far, CHS 2 and Augustin collectively coordinated applications for PPP loans that are together worth more than $24 million dollars. The evidence also shows many more PPP loans were attempted but rejected by banks or their partners, or were planned and prepared, but not submitted before CHS 2's arrest. The evidence suggests that all or nearly all of those loan applications were fraudulent, including JOHNSON's loan application.

12. Investigators have obtained many other PPP loan applications that CHS 2 has admitted he submitted as part of this scheme, based on falsified documents, and have also obtained draft documents used or intended to be used in those applications or others. These applications all follow the same pattern of fraud—many with obviously counterfeit February 2020 bank statements, and all with fabricated IRS Forms 941 (titled, "Employer's Quarterly Federal Tax Return") with the same indicia of fraud found in Augustin's initial application—but generally with even larger inflated payroll numbers, thus yielding much larger loans.[4] CHS 2 has explained to investigators that the figures in the Forms 941 were the product of a formula that allowed him to start with a target loan amount, and then "back into" the payroll figures on the form. He explained how he used figures that would produce an average monthly payroll for 2019 that, when multiplied by 2.5, would yield the requested loan amount. In turn, the number of employees reported was chosen based on fictional payroll figures, chosen to avoid an average employee salary that might

---

[4] Some loan applications also included voided checks that appear to be falsified, such as a purported Bank 5 check that appears to have been produced on a computer and, as the subject line reads, "Converted to PDF," rather than a scan of an authentic check.

raise suspicion.

13. CHS 2 has also explained that he tried to use bank statements showing that the company had a large balance. Because so few companies had such a statement, and likely also because it was easier than keeping track of their true statements, CHS 2 repeatedly submitted near-replicas of the same falsified bank statements. In particular, CHS 2 appears to have recycled one statement each from Bank 1, Bank 6, and Bank 7. In recycling a statement, CHS 2 generally changed only the account number and the account holder's name and address, such that each version of the statement had identical figures and line items throughout the statement.

14. A review of records for bank accounts controlled by CHS 2 at Bank 5 confirm CHS 2's admissions that he received numerous kickbacks, often of approximately 25% of the amount of the loans, and that he regularly wired Augustin a share of that kickback in the early stages of the scheme. CHS 2 explained that they were doing so many loans by the end of May that he changed course, instead wiring larger lump sums, collecting Augustin's shares of the kickbacks for multiple loans in one wire.

15. Investigators are still receiving and analyzing records, but based on a preliminary analysis, as of August 31, 2020, investigators had identified a total of $2,367,765.82 in transfers to CHS 2's accounts from entities that each obtained a sizable PPP loan and that were identified in the PPP files seized from CHS 2's and another co-conspirator's residences, as described below—or from individuals associated with those entities.

16. The PPP loans identified above as implicated in the foregoing kickback payments to CHS 2 represent only a fraction of the overall scheme. In executing search warrants at the respective residences of CHS 2 and CHS 3, federal agents found stacks of paper printed out and organized by entity, containing an "intake form," fabricated Forms 941, or both for each entity.

The intake forms contained fields for the information needed to fabricate the documents and fill out other aspects of the PPP application: identifying information about the owner and company, as well as bank account information for receiving the loan. A section at the end marked "BELOW IS OFFICE USE ONLY" included blank fields for the "Number of Employees," "Monthly Payroll Expense," and "SBA Loan Pre-Approval Amount." Between CHS 2's and CHS 3's residences, investigators seized paper files for PPP loan applications for approximately 80 different entities.

### *The Fraudulent PPP Loan to JOHNSON's Company: Synergy*

17. According to the Certificate of Organization for Synergy filed with the Pennsylvania Department of State, Bureau of Corporations and Charitable Organizations, Synergy is a Pennsylvania limited liability company that JOHNSON created on June 29, 2015. The Certification of Organization reflects that JOHNSON is the organizer of the company, JOHNSON signed the Certificate of Organization, and both the registered company address for Synergy and JOHNSON's address as the organizer match JOHNSON's address of record with the Pennsylvania Department of Motor Vehicles.

18. On or about May 14, 2020, a PPP loan application package on behalf of Synergy was electronically submitted to Bank 3 through Bank Processor 1. Internet protocol ("IP") session records from Bank Processor 1 for the loan application show that a computer with an IP address ending in 164 associated with the Broward County, Florida residence of a co-conspirator now cooperating with the investigation ("CHS 4") logged into Synergy's loan account on Bank Processor 1's website multiple times between May 14 and May 18, 2020.[5] Furthermore, the IP

---

[5] Following arrest, CHS 4 chose to cooperate with the investigation in the hope of obtaining favorable consideration in connection with pending charges. As discussed in greater detail below, CHS 4 collected information for Synergy and passed that information to CHS 2 to create falsified documents and applications. CHS 4 admitted to law enforcement during an interview that,

session records show that an IP address ending in 245, which according to records obtained from Verizon is associated with JOHNSON, logged into Synergy's loan account on Bank Processor 1's website on May 18, 2020. As discussed further below, May 18, 2020 is the date on which JOHNSON signed the Synergy PPP loan application documents via DocuSign.

19.  Synergy's loan application package included, among other documents: (1) four purported Forms 941 for each quarter of 2019 in the name of Synergy; (2) a purported company bank statement for Synergy from Bank 6; and (3) a Borrower Application Form for a PPP loan request of $389,627 for Synergy based upon a purported average monthly payroll of $155,851 for 16 employees (the "PPP Application Form").

20.  The purported Forms 941 submitted with Synergy's PPP loan application package show quarterly payroll of exactly $467,555.19 for each quarter, for 16 employees. That quarterly payroll figure yielded the PPP loan application's "Average Monthly Payroll" figure of $155,851, which determined the $389,627 amount of the loan. Each Form 941 was signed by hand with the name "Tonye Johnson" as the company owner, and also listed "Tonye Johnson" as the company's designee and as a "Paid Preparer," although JOHNSON is not a paid tax preparer.[6]

21.  The purported Forms 941 submitted with Synergy's PPP loan application package follow the same style and pattern, including in the indicia of fraud, as the many other Forms 941 that CHS 2 acknowledged he helped create and submit in the course of the scheme, as described

---

consistent with the IP session records, CHS 4 submitted Synergy's fraudulent PPP loan application and supporting documents to Bank Processor 1 on behalf of JOHNSON.

[6]  CHS 2 admitted during interviews with law enforcement that CHS 2 signed many of the Forms 941 included in the PPP applications. The signature on Synergy's Forms 941 included with its PPP applications resembles a signature that CHS 2 identified as one that CHS 2 forged.

above.[7] Moreover, IRS records show that Synergy did not, in fact, file any Forms 941 for any quarter of 2019 or the first quarter of 2020, and Pennsylvania Department of Labor & Industry has no business or wage record information for Synergy from January 1, 2018 through August 2020.

22. The purported company bank statement for Synergy submitted with its PPP loan application package, which was submitted in electronic format as a PDF, is a clear forgery. First, it purports to be a February 2020 bank statement from Bank 6 for an account in the name of Synergy ending in 7620. Although Synergy did have an account at Bank 6 ending in *7620 ("Bank 6 *7620"), I have compared the actual bank records received from Bank 6 for the Bank 6 *7620 account with the purported February 2020 bank statement submitted with Synergy's PPP loan application, and they are not the same. In fact, not a single transaction in the purported February 2020 bank statement submitted with Synergy's PPP loan application matches the actual February 2020 bank statement for the Bank 6 *7620 account obtained from Bank 6. Second, according to the PDF file "properties," the February 2020 statement was created using "PDFFILLER," a program used to edit electronic PDF files. The metadata shows the file was created on May 14,

---

[7] As noted above, JOHNSON was listed as both owner and paid preparer. Dozens of other Forms 941 submitted in this scheme evidence the same error. CHS 2 has admitted that these documents share that feature because he misunderstood the form, and he (or someone following his instructions) prepared the Forms 941 at issue. The content of the forms also indicate falsification. Synergy submitted four identical Forms 941, down to the penny in reported figures. They also evidence a pattern of payroll spending that is likely false: each of the quarters shows significant (but identical quarter over quarter) increases from the first to second to third month of the quarter. For each identical form, the same figures are reported for the tax liability incurred in the first month of each quarter, the same figure for the second month of each quarter (increased substantially from the first month), and the same figure for the third month of the quarter (increased substantially from the second month). The result is that the company reports a perfectly repeating cycle of ascending payroll costs within each quarter. CHS 2 has explained that this was due to a formula he used, allocating different percentages of the quarterly payroll tax liability to each month of each quarter.

2020 and modified on May 14, 2020.

23. The PPP Application Form submitted with Synergy's loan application package reflects that Synergy had 16 employees with an average monthly payroll of $155,851, which resulted in its loan request of $389,627. The PPP Application Form required the borrower to electronically initial and/or sign (via DocuSign, as explained below) a number of "certifications," including: (1) that the applicant was in operation on February 15, 2020 and had employees to whom it paid salaries/payroll taxes or paid independent contractors, as reported on Form(s) 1099; (2) that the funds would be used to retain workers, maintain payroll, or make mortgage/interest/lease/utility payments as specified by the PPP rule and that unauthorized use could result in charges for fraud; and (3) that the information provided in the application, including in supporting documents, was "true and accurate in all material respects," and that making false statements could result in criminal charges. Based on my review of Synergy's bank records and other records discussed further below, Synergy did not have 16 employees or an average monthly payroll of $155,851 as represented in its PPP Application Form.

24. As a result of the false and fraudulent representations made in Synergy's PPP Application Form and supporting documents, Bank Processor 1 approved the PPP loan application for Synergy. As explained in greater detail below, Bank 3 wired $389,627 in loan proceeds to Synergy on May 20, 2020.

*__Records Show that JOHNSON Viewed and Signed the PPP Application Form__*

25. In connection with this investigation, law enforcement obtained records from DocuSign pursuant to 18 U.S.C. § 2703(d). The DocuSign records shows that, on May 18, 2020, at 5:06 a.m., Bank Processor 1 sent the PPP Application Form to the DocuSign user "Tonye Johnson" at the email address "synergytowingtransport@gmail.com." Records obtained from Google show that JOHNSON is the account holder for the email address

"synergytowingtransport@gmail.com," and that the phone number associated with that email account is (according to AT&T records) a wireless phone number ending in 7719 assigned to the AT&T account of Synergy. The contact for Synergy's AT&T account is JOHNSON, and the 7719 phone number is the phone number listed for Synergy on its PPP Application Form. As discussed further below, JOHNSON used the 7719 phone number to communicate with Augustin in connection with the fraudulent PPP loan for Synergy.

26. Based upon these records from DocuSign, Google, and AT&T, JOHNSON viewed the PPP Application Form on May 18, 2020, at 5:06 am, and JOHNSON signed the PPP Application Form approximately one minute later.

*__Text Messages and Emails Demonstrate JOHNSON's Knowing Participation in the Fraud__*

27. As part of its investigation, law enforcement obtained communications between Augustin and JOHNSON, including text messages showing JOHNSON's knowledge that Synergy's PPP loan was submitted to and approved by Bank Processor 1.

28. Specifically, on May 14, 2020, Augustin sent JOHNSON a text message (to the 7719 phone number) asking JOHNSON to "send me a screenshot" of the last emails that JOHNSON had received from Bank Processor 1. JOHNSON replied with three screenshots of three emails that JOHNSON received from Bank Processor 1,[8] each of which is reproduced on the following page:

---

[8] The name and contact information of Bank Processor 1 displayed in the screenshots of the emails is redacted in this Affidavit to protect the privacy interest of Bank Processor 1.



29. As shown above, the three emails from Bank Processor 1 sent to JOHNSON communicated three events related to Synergy's PPP loan: (1) a "Paycheck Protection Program loan" was sent to the SBA to be processed; (2) additional action was required before the loan could be approved; and (3) the PPP loan was approved.

30. JOHNSON also sent Augustin a screenshot of a mobile phone browser that was logged into the website of Bank Processor 1, which stated: "To process your application, upload a voided check."

31. On May 19, 2020, Augustin sent a text message to JOHNSON that provided the wire instructions for the kickback payment to CHS 2, including the account and routing numbers of an account ending in 6828 at Bank 5 ("Bank 5 *6828") controlled by CHS 2. JOHNSON responded to Augustin, "Ok how much from this first one." As explained further below, JOHNSON wired $97,418 to CH2's Bank 5 *6828 account on May 21, 2020.

### *JOHNSON's Phone Calls with an Undercover Agent Confirm His Knowing Participation in the Fraud.*

32. On August 17, 2020, a federal agent acting in an undercover capacity ("UC4") had two phone calls with JOHNSON. Each call lasted approximately 12 minutes in duration and was recorded by UC4. During these two calls, UC4 purported to be an employee of Bank Processor 1 and stated that Bank Processor 1 wanted to confirm certain information contained in Synergy's PPP loan application. Among other things, UC4 asked JOHNSON how many employees were listed on his PPP application and whether that number was still correct. In response to these questions, JOHNSON stated that he had listed 16 employees on his PPP application, and that he still had 16 employees. JOHNSON further stated that his monthly payroll was "about $156,000" and that his PPP loan amount was approximately $389,000.

33. On August 24, 2020, UC4 sent four (4) text messages to JOHNSON, each of which

contained a DropBox link to an electronic copy of a Form 941 that was submitted with Synergy's PPP loan application to Bank Processor 1, that is, Form 941s for Q1, Q2, Q3 and Q4 2019, respectively.

34.     On August 25, 2020, UC4 made another call to JOHNSON. That call lasted approximately 15 minutes and was recorded by UC4. Based on JOHNSON's statements on the recording of that call, while JOHNSON was on the call with UC4, JOHNSON accessed the DropBox links previously sent to him via text message from UC4 on August 24, 2020, and viewed each Form 941 that had been submitted with Synergy's PPP loan application to Bank Processor 1. When asked by UC4 during the call if the information in each Form 941 for Q1-Q4 2019 was correct, JOHNSON answered affirmatively as to each Form 941. As noted above, IRS records show that Synergy did not, in fact, file any Forms 941 for any quarter of 2019 or the first quarter of 2020, and Pennsylvania Department of Labor & Industry records show that Synergy did not report any wages or employees for that same period.

### *Bank Records and Text Messages Confirm JOHNSON's Receipt of the PPP Loan and Further Demonstrate JOHNSON's Knowing Participation in the Fraud*

35.     As noted above, bank records show that Synergy had the Bank 6 *7620 account. A signature card for the Bank 6 *7620 account shows that JOHNSON opened the account on or about April 4, 2017 as "Sole Owner" of Synergy, and that JOHNSON is the only signer for the Bank 6 *7620 account. On May 20, 2020, the Bank 6 *7620 account received via bank wire $389,627 in loan proceeds from Bank 3 as a result of Synergy's fraudulent PPP loan application.

36.     On May 20, 2020, JOHNSON sent Augustin a text message that stated: "Morning big homie 215 pm my appointment Ill be sending then." Augustin responded "Ok." JOHNSON then sent another message that stated "Im at the bank. [Let you know] when its sent." Augustin responded, "Ok Thanks." The following day, May 21, JOHNSON sent Augustin a message that

stated "Sent," and Augustin responded "Thanks I will tell him."

37. Bank records show that on May 21, 2020, JOHNSON wired $97,418, which equaled approximately 25 percent of the proceeds of Synergy's PPP loan, from the Bank 6 *7620 account to the Bank 5 *6828 account controlled by CHS 2. That same day, Augustin sent a message to CHS 2 that stated, "Synergies wire is done," and CHS 2 responded "97418 synergy tonye."

38. A document titled "Wire Full Transaction Report" provided by Bank 6 for the May 21, 2020 wire from JOHNSON to CHS 2 indicates that JOHNSON knew the payment to CHS 2 was not an ordinary commission for a loan because JOHNSON disguised the true nature of the payment. Specifically, the "Details" section of the transaction report contains the following description of the kickback wire: "New investment opportunity to expand to a new state."

39. During a recorded call with another federal agent acting in an undercover capacity ("UC3"), JOHNSON told UC3 that JOHNSON paid his employees by check. I have reviewed Synergy's bank records from January 2019 through July 2020, and those bank records show that, for a typical week, JOHNSON paid between one and three employees by check in amounts between approximately $500 and approximately $650. In all of the bank records and other records that I have reviewed in this investigation, I have not seen any indication that Synergy had a monthly payroll of $155,851 as represented in its PPP loan application documents.

## CONCLUSION

40. Based on the forgoing, I respectfully submit that there is probable cause to believe that TONYE JOHNSON committed the Target Offenses.

FURTHER YOUR AFFIANT SAYETH NAUGHT.

_____
MICHAEL BENIVEGNA
Special Agent
IRS-CI

Attested to by the applicant in accordance
with the requirements of Fed. R. Crim. P. 4.1
by FaceTime on this  18th  day of September, 2020

_____
HON. ALICIA O. VALLE
UNITED STATES MAGISTRATE JUDGE